LOLLEY, J.
11 Defendant, Wayne J. Guidry, Jr., appeals a judgment from the Second Judicial District Court, Parish of Claiborne, where a jury found him guilty as charged of the second degree murder of Stephanie Pepper Sims. He was sentenced to life imprisonment without benefits. For the following reasons, we affirm.
FACTS
Stephanie Pepper Sims disappeared on January 5, 2003. On February 13, 2003, after a six-week search, her body was found in a secluded hole located in the Jackson Bienville Wildlife Management *945 Area (“Wildlife Management Area”) near Quitman, Louisiana. She had suffered a single gunshot wound to the chest. Wayne Guidry was subsequently indicted for second degree murder. After a nine-day jury trial at which the following facts were adduced, Guidry was found guilty as charged.

Background

Stephanie, 30, was an assistant professor of English at Louisiana Tech University (“Tech”). She was married to David Sims in August of 1998, and they lived together in Ruston, Louisiana. She met the defendant, Wayne Guidry, on the evening of November 20, 2002, when she and a friend, Ginger Hoover, went to Stow’s Bar in Ru-ston to mark the end of the semester. Guidry introduced himself to the women and engaged them in small talk for several hours. He said he was in town for the weekend to hunt and described himself as a professional golfer who was in his off-season. Stephanie spent the rest of that evening and the weekend with |2Guidry, which marked the beginning of their six-week clandestine romantic affair.
After having known Stephanie for only a few days, Guidry professed his love for her. Stephanie separated from David within a week of meeting Guidry. David, unaware of Stephanie’s affair, helped her move out of their Ruston home and into an apartment in West Monroe, Louisiana. According to David, Stephanie was looking forward to being on her own for the first time in her life.
Ever the opportunist, Guidry began living with Stephanie. Stephanie financially provided everything for him while they were together. Stephanie visited Guidry’s hometown of Luling, Louisiana, to meet his family that Christmas. Stephanie eventually introduced Guidry to her mother, Barbara Pepper. She also told her father, Howard Pepper, about Guidry and the two were going to meet the week Stephanie came up missing.
After a few weeks, Stephanie and Gui-dry began to have frequent arguments. Stephanie told Ginger that she was ready for Guidry to “not be there all the time.” Ginger was also present during a discussion between Stephanie and Guidry involving the possibility of Stephanie getting $100,000.00 if she were to divorce David. Ginger’s last conversation with Stephanie was when Stephanie called and wanted to make plans for New Year’s Eve because she and Guidry were not getting along.

Sunday, January 5, 2003: Stephanie’s disappearance

At about 8:30 a.m. on Sunday, January 5, 2003, Stephanie called her mother and discussed her plans for the day. Stephanie told her mother that|sshe was going to church with David in Ruston and that Gui-dry wanted her to return to West Monroe afterward because he “had a surprise for her.” Stephanie told her mother that she would call her later to tell her about the surprise. This was the last time Barbara spoke to Stephanie.
Stephanie arrived at her Ruston home at about 9:30 a.m. When Stephanie and David arrived at the church at about 9:45 a.m., the parking lot was empty. David then remembered that there was going to be a community-wide send-off that day for military troops going to Iraq and the local churches were participating. David then entered the church foyer to return a book. Phone records and the church pastor confirmed David’s testimony regarding the phone call and stop at the church.
David and Stephanie then left the church and went shopping at Wal-Mart at about 10:00 a.m., as verified by the surveillance tape. Surveillance photographs further verified David’s testimony that they then went to a Citgo station for Stephanie *946 to get a beverage at about 10:45 a.m.[1] Afterward, Stephanie and David went to their home, where Stephanie wrote a check to pay a dry-cleaning bill. The check was later found in an envelope in Stephanie’s car. David explained to Stephanie that he had accepted the fact that their marriage might end in divorce, and he was starting to try to make the best of the situation. Stephanie asked David if he would be willing to go to counseling and he agreed.
14At about 11:15 a.m., Stephanie and David walked outside to Stephanie’s car, where they were observed by their neighbor. Stephanie then left in her car to return to West Monroe at about 11:30 a.m. This was the last time David saw Stephanie alive. David spent the rest of day and evening at his Ruston home. David’s neighbor verified that she saw his truck was under his carport at various intervals throughout that afternoon and evening.
Barbara did not hear back from Stephanie that Sunday afternoon. She began calling both her cell and apartment phone numbers, but was unable to reach her. Barbara, worried that something had happened to Stephanie, alternated dialing both phone numbers all night until she finally fell asleep.

Monday, January 6, 2003: The Search for Stephanie

On the morning of January 6, Howard Pepper called Tech to see if Stephanie arrived to teach her 8:00 a.m. class, but nobody had seen or heard from her and her classroom was still locked. Howard and Barbara immediately drove to Stephanie’s West Monroe apartment. An apartment maintenance man unlocked Stephanie’s apartment door for the Peppers sometime between 10:30 and 11:00 a.m. The apartment looked normal and orderly and neither her purse nor her cell phone was found inside. Her computer was on and connected to the internet through a dial-up connection that used the phone line. When they terminated the internet connection, Stephanie’s phone immediately began to ring. Barbara answered the phone.
The caller was Guidry inquiring about Stephanie. Barbara told Guidry that they were looking for her and asked Guidry when he last saw|RStephanie. He said he saw her “last night at the apartment.” Guidry also told Barbara that he last talked to Stephanie on the phone at about 6:30 a.m. Guidry explained to Howard that he was driving home to get his vehicle. He suggested to Howard that perhaps Stephanie’s car would not start this morning and told them she kept a spare key in a magnetic key holder behind the gas cap. The Peppers went outside to check Stephanie’s car, which was located in the apartment parking lot. They noticed that the driver’s seat was positioned far back and the engine was still warm to the touch, indicating that the car had been driven within the last three hours. They also noticed that the exterior of Stephanie’s car was uncharacteristically muddy on the sides and fender wells. Using the hidden key, the car started up immediately. It was then that the Peppers contacted police to report that Stephanie was missing.
Barbara had contacted David early that morning to find out if he had seen or heard from Stephanie. After checking with Stephanie’s office at Tech, David called Stephanie’s apartment repeatedly. In an ef *947 fort to help find Stephanie, David also contacted Ginger. It was on this day that David first became aware of Stephanie’s affair and heard Wayne Guidry’s name for the very first time.
That evening, the Peppers received a phone call from Guidry. He told them he was concerned about Stephanie and planned to return later in the week to help find her. Howard urged Guidry to contact the West Monroe Police Department immediately. Guidry called the Peppers again and told them that he could not reach the police station and said that it must be | ficlosed. It was later established that the police station was not closed at the time Guidry allegedly called.
Guidry also told the Peppers in a later conversation that Stephanie had recently attempted to commit suicide. He explained that she was in the bathroom taking her bath when the apartment lights went out. When he jumped up to check on her in the bathroom, Guidry said Stephanie was standing in the tub with the hair dryer down in the tub. This information raised “red flags” for Howard Pepper, who understood electricity and electrical code requirements and knew the apartment lights would not go out if the bathroom outlet was overloaded.

Over the next 6 weeks: The investigation

The investigation began as a search for a missing person. It was determined that Stephanie’s apartment showed no signs of forced entry, nor were there any other indications that it was a crime scene. Detectives performed an experiment in Stephanie’s apartment bathroom and determined that it was physically impossible for the hair dryer to reach the tub while plugged into the electrical outlet. It was further determined that the apartment bathroom had a circuit breaker/ground fault interrupt electrical outlet. When the outlet was overloaded, the lights in the apartment did not go out. Also, the Lor-cin .25 caliber automatic pistol Stephanie’s father gave her in 1996 to use for protection was not located, but two boxes of .25 caliber ammunition were found in an open metal box in the bedroom closet of her apartment.
|7Every aspect of the detectives’ interviews with David regarding his last hours with Stephanie was corroborated by witnesses and physical evidence. Investigators decided they needed to speak with Guidry after learning of his relationship with Stephanie and the fact that, by his own admission, he was the last person to see and speak to Stephanie.

1) Interviews with Wayne Guidry

On the evening of January 7, Detective Jeff Terrell of the West Monroe Police Department conducted his first interview with Guidry, who was advised of and waived his Miranda rights. Guidry told Detective Terrell that he had returned to the area to help find Stephanie. Guidry described how he and Stephanie met and their relationship. He said that Stephanie told him she loved him within just a few days, and soon decided to leave her husband and move into an apartment. Guidry related that Stephanie asked him to move in with her, and she provided everything for him. Guidry said Stephanie told him to sell his truck, and she gave him a $3,000.00 check to use to fix his other vehicle. He claimed that she also allowed him to use her credit card to purchase golf clothes and clubs totaling about $5,000.00.
Additionally, Guidry said that Stephanie told him that she would be getting about $100,000.00 in her divorce from David. After she got the money, Guidry explained that they planned to move to Tennessee where he would play golf and she would go back to school. Charges to Stephanie’s *948 credit card for the internet purchase of golf equipment on January 4th at 8:36 a.m. for $4,775.99 and on January 5th at 10:52 a.m. for $832.41, and | sthe subsequent shipment of the second order, were all later verified by trial testimony and physical evidence. It was also verified that Guidry sold his truck to a wrecking service.
In that first interview, Guidry explained his version of what happened on January 5, 2003. Guidry said Stephanie returned to the apartment about 11:45 a.m. after spending the morning with David in Ru-sten. He then fixed lunch and they ate. His account of that day’s events resumed at about 11:45 p.m. Guidry said he was watching a movie when the apartment lights went out. He got up to check on Stephanie and discovered her in the bathtub holding a hair dryer. She unemotionally told him, “Oh, it didn’t work.” Guidry said that they then got into an argument about him going to Luling, and she told him to leave the apartment. He asked her what he should do with the $3,000.00 check, and she told him to keep it.
Guidry claimed that he picked up his bags, went outside and waited in the cold for about 20 to 30 minutes. Then he used Stephanie’s spare car key to open the car to stay warm. He then drove her car around West Monroe and later returned to the apartment. During this time he said he tried to reach Stephanie on her home and cell phones, but Stephanie did not answer. Guidry told Det. Terrell that he also tried to open the apartment door, but it was locked. During the early morning hours of the next day, Guidry claims that he tried unsuccessfully to get a rental vehicle. He said that he drove Stephanie’s car back to the apartment at about 6:00 a.m. the next morning and called her. He could hear the phone ringing inside, but. she did not Ranswer. Guidry left in Stephanie’s car again and went to the bank to cash the $3,000.00 check.
Then he drove back to the apartment, parked Stephanie’s car, walked to a gas station and rented a U-Haul to drive to Luling. In Luling, Guidry explained that he got his own vehicle, an Isuzu Rodeo, out of the shop and bought four new tires. Guidry then suggested to the detectives that Stephanie might be with her friend Ginger. He also told police that Stephanie had “lots” of boyfriends — more than 30. The cashing of the check at Community Bank at 8:09 a.m., the rental of the U-Haul, and the repairs and new tires on Guidry’s vehicle were all verified by trial testimony and physical evidence; however, the phone calls were not verified.
Guidry consented to the search of his vehicle and of his family’s camp, where two duffle bags, some golf clubs, Stephanie’s laptop computer and a U-Haul receipt were found. The owner of several camps located near the Wildlife Management Area verified that she saw the two duffle bags and some other items on the porch of Guidry’s nearby camp on January 6. Several days later, Guidry arrived at the camp in a red jeep-type vehicle and picked up the items.
In a second interview on January 9, Guidry, who was advised of and waived his Miranda rights, gave Det. Terrell new details about his last day with Stephanie. He added that he and Stephanie had sex on January 5th, and had driven around to several places outside West Monroe, including Quitman. Guidry explained that they returned to the apartment before sunset. He later used Stephanie’s car to try to get a rental car for his trip to 11flLuling. When he was unable to get the rental, he filled Stephanie’s car with gasoline at the Chevron station, paid for the gas with Stephanie’s credit card, and returned to the apartment. Then Stephanie *949 told him to leave. Guidry also added that at some point during that night, he drove Stephanie’s ear to the camp and dropped off his golf clubs. Detective Terrell construed these additional facts and the failure to mention the “hair dryer suicide attempt” in Guidry’s second statement as significant inconsistencies. A charge for gasoline made on Stephanie’s Chevron credit card on January 5th was later verified.
When asked about Stephanie’s pistol, Guidry said he last saw it in the door pocket of Stephanie’s car on January 5th when he was driving the vehicle. This conflicted with information obtained from David, who stated that he had only seen her pistol once, and he never knew her to keep it in her car. Also, after being asked four or five times if he had anything else of value belonging to Stephanie, Guidry finally admitted that he had Stephanie’s laptop computer. Later during this second statement, Guidry suggested to Det. Terrell several rural locations where Stephanie might have gone to commit suicide, including one location in or near the Wildlife Management Area. However, he had no explanation of how Stephanie could have committed suicide at one of these locations and return her car to the apartment parking lot. By this January 9th interview, Wayne Guidry, Jr., had become a prime suspect in Stephanie’s disappearance.
After being advised of and waiving his Miranda rights, Guidry gave a third interview on January 23, which was recorded. This time Guidry |ubrought up the possibility that he had a “black-out” due to a chemical imbalance. When the detectives mentioned using infrared radar technology to locate Stephanie’s body, Guidry asked if it could detect heat “underground.” Gui-dry further suggested that David had something to do with Stephanie’s disappearance, but ultimately placed blame for his predicament on Stephanie.

2) Further Investigation

Telephone records and forensic computer analysis indicated that internet access was obtained from Stephanie’s apartment on January 5th from 8:26 a.m. through 11:14 a.m., during which golf and pornographic websites were viewed.[2] Then, after a six and a half hour lapse of time, internet activity resumed at 5:25 p.m. The websites viewed at various times throughout the evening included pornographic sites, the Community Bank, Greyhound Bus, U-Haul and the Yellow Pages for an automotive business. Then centerfold and golf websites were viewed intermittently throughout the early morning hours. All internet activity from Stephanie’s apartment ceased at 4:34 a.m. on January 6th.
Further investigation revealed that the last person to see Stephanie alive other than Guidry was Sarah Fitzpatrick, a convenience store clerk at Handy Foods in Quitman. Sarah remembered seeing her at Handy Foods on that Sunday, January 5th.
| ^February 13, 2003: The discovery of Stephanie’s body
Detectives spoke with Wayne Guidry, Sr., the defendant’s father, and Eric Du-frene, a close friend of Guidry’s, who hunted with him at the Wildlife Management Area on several occasions. Based on information obtained from these interviews, it was learned that Guidry found a hole in Wildlife Management Area and had actually shown the hole to Dufrene. Guidry also had described the location of the hole to *950 his father in such detail that his father was able to provide a detective with directions to the hole. When asked by detectives where they should look for Stephanie’s body if Guidry had something to do with her disappearance, Dufrene told them to look for that hole in the Wildlife Management Area. After two unsuccessful searches, a massive search of the described area conducted on February 13, 2003, involving hundreds of officers from different agencies led to the discovery of Stephanie’s body in the secluded hole.
The autopsy revealed that Stephanie died of a single gunshot wound to her mid-chest inflicted at a slightly downward angle. In addition to her torn clothing, Stephanie’s body also had post-mortem drag abrasions. This evidence indicated that the murderer shot Stephanie, waited for her to die, dragged her body by the feet, and dumped her in the hole. Analysis of evidence taken from a sexual assault kit revealed that sperm cells on the vaginal smear slide contained DNA matching that of the defendant. However, there were no signs of vaginal or rectal trauma.
The bullet recovered from Stephanie’s body at the autopsy was a small caliber jacketed bullet — likely fired from one of 30 different weapon | isbrands. Although the murder weapon was never recovered, it was established that the bullet recovered from Stephanie’s body could have been fired from a Lorcin .25 caliber automatic pistol like the one Stephanie owned. Stephanie’s pistol was also never located; however, the two boxes of .25 caliber ammunition found in her bedroom closet were also determined to be consistent with the bullet taken from her body.

Procedural History

Guidry was subsequently indicted for second degree murder. A defense motion for a change in venue was granted and the trial was moved to Claiborne Parish. Proceedings on various other pretrial motions were held. Guidry entered a plea of not guilty.
Among the evidence produced during Guidry’s trial, the state presented testimony of inmate Terry Coleman regarding Guidry’s jailhouse confession of guilt in Stephanie’s murder. The jury was made aware that Coleman was incarcerated in Jackson Parish on a first degree murder charge and of his mental status. Coleman, who stated that he had been promised nothing in return for his testimony, appeared at Guidry’s trial with counsel and told his story. Coleman was extensively cross-examined at trial on issues impacting his credibility as a witness.
After the nine-day jury trial, Guidry was found guilty as charged of second degree murder. Defense motions for new trial and post-verdict judgment of acquittal were heard and denied. Guidry was sentenced to serve a term of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. This appeal followed.
luLAW AND DISCUSSION

Sufficiency of the Evidence

Guidry argues that the evidence was insufficient to support his conviction for second degree murder. Specifically he contends that since Terry Coleman’s testimony was not credible, and all other evidence was circumstantial, the state failed to exclude every reasonable hypothesis of innocence.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal *951 under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 1997-1203 (La.10/17/97), 701 So.2d 1333.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 1996-1048 (La.10/04/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-_J11615 (La.10/16/95), 661 So.2d 442. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.09/25/98), 719 So.2d 610, writ denied, 1998-2723 (La.02/05/99), 737 So.2d 747.
Even without considering the testimony regarding Guidry’s jailhouse confession, a review of the record reveals that the state’s evidence was indeed sufficient to support Guidry’s conviction for the second degree murder of Stephanie Pepper Sims. Specifically, the state proved by direct and circumstantial evidence that Guidry began a romantic affair with Stephanie, and she subsequently separated from her husband, David. Stephanie financially supported Guidry, and he anticipated that she would get a large sum of money from her divorce. On the day of her disappearance, the state proved that Stephanie spent the morning with her husband and testimony from her mother indicated that Stephanie planned to see Guidry, who had a “surprise” for her.
Guidry admitted that he took Stephanie for an afternoon drive. They stopped at a convenience store in Quitman, which is near Guidry’s family’s 11fihunting camp and the Wildlife Management Area. Stephanie’s body was later found in a secluded hole located in the Wildlife Management Area. Guidry had previously disclosed the location of the hole to two trusted persons — his father and a close family friend. Further, Stephanie’s car was found with unusual amounts of mud on the car, and the driver’s seat was too far back for Stephanie to be the last driver. The state showed that beginning at 5:25 p.m., Guidry viewed internet websites for a local bank, Greyhound Bus, U-Haul, and an automotive business-indicating his next move. Early the next morning, Guidry cashed Stephanie’s $3,000.00 check, then fled to Luling in a U-Haul. There he spent Stephanie’s money to fix up his vehicle. Gui-dry admitted to Stephanie’s parents and the police that he was the last person to see or talk to Stephanie. Of notable interest were his inconsistent statements during his three interviews with the detectives, including all the uncorroborated phone calls he allegedly made. In addition, Stephanie’s gun was never found, and evidence presented at trial proved she was *952 shot in the chest with a bullet consistent with one from her own .25 caliber Lorcin. In light of .the evidence establishing that her body showed signs of being dragged and her vehicle was found at her apartment, the state also discounted Guidry’s implications that Stephanie committed suicide.
Finally, Terry Coleman’s testimony only supplemented the wealth of evidence already ascertained to convict Wayne Gui-dry, Jr. His jailhouse confession included that Guidry shot the victim in the Wildlife Management Reserve, threw her into a hole, and disposed of the gun in a pond near the hole. Sheriff Andrew Brown confirmed that the letter, written by Terry |17Coleman, contained details of the crime that were not known to the media. Attempts by Guidry to place blame on David Sims and on Stephanie herself are totally unsupported by the record. We conclude that the presented evidence was overwhelming and more than sufficient to eliminate every reasonable hypothesis of innocence for the second degree murder of Stephanie Pepper Sims.

Admission of the Jailhouse Confession

Guidry also argues that the trial court erred in allowing Terry Coleman to testify regarding the alleged jailhouse confession despite the fact that the trial court knew Coleman had been diagnosed as a paranoid schizophrenic with auditory hallucinations.
Louisiana C.E. art. 601 provides that every person of proper understanding is competent to be a witness except as otherwise provided by legislation. Furthermore, a witness may testify to a matter based on personal knowledge. La. C.E. art. 602. Great weight is given to the trial judge’s determination of competency because of his or her opportunity to see and hear the witness. La. C.E. art. 104(A); State v. Willars, 27,394 (La.App. 2d Cir.09/27/95), 661 So.2d 673. Matters such as mental defect go to the witness’ credibility, not to competency. State v. Wilkerson, 448 So.2d 1355 (La.App. 2d Cir. 1984), writ denied, 450 So.2d 361 (La.1984).
The trial court conducted a competency hearing outside the presence of the jury, during which Terry Coleman admitted that he had been found incompetent to proceed in his pending murder proceedings. The following questioning transpired:
11sMr. Holland: All right. Mr. Coleman, do you know the difference in telling the truth and telling a lie?
Mr. Coleman: Yes.
Mr. Holland: Do you know what perjury is?
Mr. Coleman: Yes.
Mr. Holland: Would you explain to the Court what your understanding of perjury is?
Mr. Coleman: Perjury is lying under oath.
Mr. Holland: All right. The determination the Court would need to make is that you know the difference in telling the truth and telling a lie right now.
Mr. Coleman: Sure.
Following the hearing, which included direct and cross-examination of Terry Coleman, the trial court determined that he was competent to testify as a witness at Guidry’s trial. The trial court gave a summary of the facts and explained its reasoning. It acknowledged that Coleman had been incarcerated since 1998 on a first degree murder charge. The seven-year pretrial detention was explained by Coleman being found incompetent to stand trial due to substantial mental illnesses including schizophrenia with auditory hallucinations.
*953 Although the trial court observed that the second part of the inquiry — Coleman’s personal knowledge-was “troublesome,” it found that the state established that Coleman had a proper understanding to testify by showing that he understood the difference between truth and lies. The trial court noted that issues of any disability relate to Coleman’s credibility and not his competency to testify. In Wilkerson, this court stated:
Certainly, this witness’ defects of capacity, sensory or mental, which would have lessened her ability to perceive the facts which [the witness] purports to have observed were provable to attack the credibility of the witness, either upon cross-examination or producing other witnesses to prove the |1fldefect. However, such matters go to [the witness’] credibility, not to [the witness’] competency, which was properly determined by the trial court. (Internal citations omitted.)
State v. Wilkerson, 448 So.2d at 1361-1362. Finally, we note that the Louisiana Supreme Court has never ordered a blanket exclusion of jailhouse witness testimony. State v. Robinson, 2002-1869 (La.04/14/04), 874 So.2d 66, cert, denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).
The record supports the trial court’s ruling that Coleman was competent to testify as a witness at Guidry’s trial. Coleman’s answers to questioning demonstrated that he had proper understanding and his testimony was based on personal knowledge. Although Coleman’s testimony did not include information regarding his actual diagnosis, it did include sufficient information regarding his prior mental incompetency to stand trial and history of auditory hallucinations. Therefore, based on our thorough review of this record it cannot be said that the trial court’s determination was manifestly erroneous.

Fair Trial

Next, Guidry argues that he was denied a fair trial as a result of the introduction of Terry Coleman’s testimony. The Fifth and Fourteenth Amendments of the U.S. Constitution and La. Const, art. 1, § 2 provide that no person shall be deprived of life, liberty or property without due process of law. Other than the general reference to the Due Process Clause of the Fifth and Fourteen Amendments and the claim that the use of Coleman’s testimony deprived Guidry of a fair trial, Guidry offers no legal support for his argument. In fact, Guidry merely reargues issues of evidence sufficiency | anand witness competency. However, this court has determined the evidence to be sufficient without consideration of Coleman’s testimony, and further that the trial court did not err in finding Coleman competent to testify; therefore Guidry’s argument is meritless.

Ineffective Assistance of Counsel

Finally, Guidry contends that he received ineffective assistance of counsel. Specifically, he argues that his counsel failed to introduce evidence or testimony to explain the significance of Terry Coleman’s adjudication as incompetent to stand trial and his mental diagnosis. As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (“PCR”) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La. App. 2d Cir.06/21/00), 764 So.2d 1164. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id. Here, the record is sufficient for review of Guidry’s claim of ineffective assistance of counsel. It may therefore be resolved on direct appeal in the interest of judicial *954 economy. State v. Ratcliff, 416 So.2d 528 (La.1982).
The right of a defendant in a criminal proceeding to effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed Is^by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, Guidry first must show that counsel’s performance was deficient. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra. The assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Moore, 575 So.2d 928 (La.App. 2d Cir. 1991); see also State v. Tilmon, 38,003 (La.App. 2d Cir.04/14/04), 870 So.2d 607, writ denied, 2004-2011 (La.12/17/04), 888 So.2d 866.
Second, Guidry must show that counsel’s deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. Guidry must prove actual prejudice before relief will be granted. He must show that but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Pratt, 26,862 (La.App. 2d Cir.04/05/95), 653 So.2d 174, writ denied, 1995-1398 (La.11/03/95), 662 So.2d 9.
[ ¡¡¡¡In the case at bar, the record reflects that through the defense counsel’s skilled and thorough cross-examination, the jury was given a plethora of information regarding Coleman’s mental health to use in judging his credibility. In fact, at one point during questioning, Coleman was asked, “Do you believe that you would believe the letter of a crazy man saying somebody confessed to me?” Coleman responded, “I sure wouldn’t.”
Even if the alleged failure of defense counsel to introduce such testimony and medical reports were considered to be unprofessional error, Guidry has not shown that, but for this alleged error, there is a reasonable probability the outcome of the trial would have been different. We find Guidry’s argument to be without merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence for Wayne Guidry, Jr. is affirmed.
AFFIRMED.

. The surveillance tape had a date stamp of 23:40:31 — a military designation which translates to 11:40 p.m. However, the footage was clear that Stephanie and David were at the Citgo during daylight hours, and a still photograph of the same image was date stamped 11:44 a.m. Further evidence revealed that the video and cameras had not been changed to reflect daylight savings time which would explain the hour time difference.

. Pornographic websites were referred to at trial as ''centerfold” websites to prevent any undue prejudice to the defendant.