REDMANN, Judge.
Defendants appeal on both liability and quantum from a judgment on jury verdict for personal injuries and property damages in an omnibus-automobile intersectional collision.
LIABILITY
Defendants’ contrary evidence from independent witnesses could have supported a contrary conclusion on liability. We nevertheless find that the jury’s conclusion on liability is sufficiently supported by evidence that defendant bus driver drove (at a speed of about 20 mph) through a red light which had been red during about the last half block of her travel towards the intersection. The testimony of one independent witness who resided at the intersection is perhaps the most consistent and supportive (although his estimate of the bus’s speed is higher than most witnesses’). His testimony is deemed suspect by defendants, both because he was not discovered as a witness until 15 months after the accident (the weekend before trial) and because he testified that he said to himself, as he saw the bus approaching a half block away as its light turned red, “I bet this bus runs the light.” That neither plaintiff nor defense counsel earlier discovered an eye-witness who lives above a shop at the corner of a serious intersectional collision does not make the witness suspect, much less justify rejecting his testimony. Nor does the witness’s remark that, before the bus ran the red light, he would have bet it would do so. This remark but reported a common experience of recognizing that a driver is failing to make appropriate initial response to some stimulus, such as the changing traffic light here, from which failure one infers that the driver has not perceived the stimulus and will not react at all.
QUANTUM

General Observations

In reviewing general damage awards, a court of appeal finds itself in a dilemma. On the one hand, because the scope of our appellate review includes facts, La.Const.1974, art. 5 § 10(B), we are obliged on an appellant’s request to determine the appropriateness of the amount of damages awarded for the injuries suffered. See Coco v. Winston Industries, Inc., La.1976, 341 So.2d 332. On the other hand, because the lower court has by law “much discretion” in fixing quantum of general damages, La.C.C. 1934(3), we are frequently reminded by the Supreme Court that we may not merely substitute our opinion of appropriate quantum for that of the trier of fact, see Coco, supra: to which admonition Coco now adds, obiter dictum, that after finding a clear abuse of the “much discretion” of the trial court we can disturb an award “only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.” 341 So.2d at 335.
Coco, even so, points out that the question whether the much discretion has been abused is “a judgment call,” id. at 335.
Our judgment is that the much discretion has here been abused in the three quanta appealed. Upon our review of the record *604 we reach an opinion of what the maximum quantum should be and we compare the jury award. We have found the awards far exceed our estimate of the maxima — by multiples, rather than minor amounts or percentages explainable by the natural differences among reasonable evaluators.
We therefore reduce the three quanta appealed, confessing doubt as to our understanding of Coco’s obiter dictum which would limit our reduction to the “highest” point of the trial court’s discretion. For example, we reduce a $500,000 award to $80,000 (with some question whether that is still too generous) — an amount which we believe approximates the highest .award that is “reasonably within the discretion” of the trial court. Yet, had the trial court awarded $81,000, we admit we would probably not have reduced. Why not, then, acknowledge that $81,000 is “within the discretion” and award it? Or $82,000? And what of $85,000? Can we pretend that when $80,000 is acceptable for general damages, $90,000 is not? Or $100,000? If $100,-000, why not $125,000?
We conclude that Coco’s dictum must be interpreted to require us to do no more than approximate the limits which we deem overstepped by the trial court. That is what we now do in considering the quanta individually, although in two of the three we find errors which might justify ignoring the jury’s quantum rather than merely treating it as excessive.

Janis Caroilo

Perhaps most evidently excessive is the $500,000 for Mrs Carollo’s bad but surgically revised facial burn and other facial scarring, a compression fracture of a vertebra, and other injuries.
The third-degree burn on Mrs. Carollo’s left cheek came from a light bulb from her automobile’s instrument panel. The burn was four or five centimeters in diameter and took three months to cover itself with scar tissue without skin graft. Five months thereafter plastic surgery excised that principal scar and other scarring from lacerations in the area of left cheek ahd temple. The excision removed an area ten centimeters long and four centimeters wide (at its widest), and left a fairly regular thin-line scar. To the casual observer this thin scar is not very noticeable and — as the plastic surgeon observed — “professional cosmetic help” would make the scar less visible. An important related item of damage is an estimated five per cent permanent paralysis of the left facial muscles.
The compression fracture of Mrs. Carol-lo’s fifth cervical vertebra was treated by traction and then “four-poster” brace until six weeks post-accident and thereafter by soft cervical collar for seven weeks. The injury which caused the fracture also caused some arthritic change from which Mrs. Caroilo experiences at times a burning sensation in her neck.
Counsel’s repeated references in argument to the jury to five broken ribs and 400 sutures are unsupported. The medical testimony and the hospital records give no hint that any rib was broken (except that one doctor agrees that Mrs. Caroilo said she had five broken ribs) and makes no reference to sutures except to note that a deep facial laceration was sutured. Mrs. Carollo’s testimony that she had five broken ribs is obviously hearsay (perhaps double hearsay from her husband, who testified that he was told she had five broken ribs) and the failure of the hospital records to mention broken ribs suggests that this hearsay was erroneous. Similarly her testimony of 400 sutures is presumably hearsay of undisclosed source.
Mrs. Caroilo did have other injuries, among which was one to the pericardium evidenced by a “friction rub” which lasted several days although electrocardiograms and chest x-rays were normal.
We conclude that the maximum award for the proven injuries of Mrs. Caroilo would approximate $80,000, to which we reduce her award.

Scott Caroilo

Scott was four years old at the time of the accident. He had impaired hearing, for which he wore a hearing aid. While *605 Scott had some facial laceration on the left side leaving minimal scarring, his most serious physical injury in the accident was a bilateral basilar skull fracture, which healed without incident or residual problem. Perhaps more frightening to young Scott was awakening in a strange hospital, without his hearing aid, and not understanding his circumstances.
The jury’s $20,000 award exceeds even the “much discretion” of C.C. 1934(3). We conclude $10,000 approximates the maximum award for Scott, and we reduce his award to that sum.

Charles Carollo

Charles Carollo, seven years old at the time, was grievously hurt in the accident and suffers profound residual injury. We will not describe his many comparatively minor injuries, although we keep them in mind in evaluating quantum.
The gross injury to Charles was to his brain stem. This injury produced a two-month coma (requiring tracheotomy and catheters), permanent reduction of intellectual power, alteration of personality, virtually complete disability of his left arm and 70% disability of his left leg.
The coma was attended with typical complications, including infections and severe weight loss. Charles’s comatose state, however, spared him pain and suffering; so he should be compensated, in respect to the coma considered by itself, principally for the loss of two months of his conscious existence.
The reduction in intellectual ability, defendant argues, was unsatisfactorily proven. The evidence includes both some pre-accident evaluations from school sources and post-accident evaluation by a psychologist. From the evidence the jury could reasonably conclude that Charles changed from a child of bright normal intelligence to one of “dull-normal” Wechsler IQ range of 79-81.
The personality change, from retiring to aggressive, is similarly supported by the evidence. Some might deem an outgoing personality more attractive than a shy one, but aggressiveness can be an undesirable trait and both psychiatrist and psychologist deem the change a matter for concern.
The lower left arm and hand remain in a formed-plastic splint to prevent the hand’s clawing and to provide a modicum of usability to the arm. Disability of the arm is rated at 100%.
The left leg is only usable because of a brace which enables a limping walk. Disability is 70%.
Plaintiff attempted to show, as special damage, the loss of Charles’s earning capacity. A psychologist opined that Charles’s employment possibilities had been reduced to jobs like gateman or washroom attendant because of his physical and mental limitations. An economist compared the $2.30 hourly minimum-wage pay for such jobs with the $188 average weekly pay for manufacturing jobs in Louisiana, and testified that for then nine-year-old Charles, the trial-time values (discounted at 5%) of earnings over 43.4 years work-life expectancy (with increases of 7% compounded annually) are $303,782.05 and $620,772.24,[1] respective *606 ly (indicating a loss in earnings of $316,-990.19, although this figure was never testified to).
The economist’s testimony appears, on its face, to be inconsistent in respect to three important premises, namely (1) that, over as long a period as the 43.4-year work-life expectancy of an 18-year-old, inflation’s rate is 4% compounded annually (meaning that in 43.4 years inflation would raise average prices to 527% of base) and that ordinary wages over the same period increase an additional 3% compounded annually because of productivity (bringing wages to 1761% of base); (2) that an 18-year-old on his first manufacturing job would earn the average manufacturing wage, and (3) that the federal minimum wage will increase 3% compounded yearly as a premium for productivity (in addition to 4% compounded yearly to keep pace with inflation) over the 43.4-year work-life expectancy of Charles Carollo.
If premise (1) is correct, then premise (2) is not. If wage-earners receive premium pay for productivity resulting from experience, then a worker with experience gets higher pay than a beginning 18-year-old, and a worker with 40 years of experience gets higher pay than one with 20 years of experience. The average pay in any given craft or trade must go to workers with more or less average experience, and not to the 18-year-old novice. If the novice gets average pay, who would get the lower-than-average pay that must exist to offset the higher pay of the long-experienced worker in order to have an average? If the 18- and the 60-year-old are paid the same — all getting average pay (differences existing only from one craft to another) — then the premise that productivity raises average wages 3% compounded annually is wrong, and the postulated total increase of 7% compounded annually would be due in no part to productivity but exclusively to inflation (which the economist testified is only 4%).
Furthermore, if premise (1) is correct, then premise (3) is not. If 3% of the postulated 7% annual wage increase is due to productivity, then the minimum wage would presumably not get that 3% but remain a minimum (increased only for inflation) for those unfortunate workers whose productivity does not increase with experience — or who have as yet no experience.
Yet the economist expressed as a factual premise that the 3% increase for productivity “has prevailed since 1940 in the United States as an average.” Thus we incline towards rejecting premises (2) and (3).
In addition to the problem of reviewing the jury award of $1,000,000 in the light of the inconsistent testimony of the economist, a serious difficulty exists in that plaintiff repetitively argued to the jury that the present value of Charles’s lost wages was $620,000, when that figure ($620,772.24) supposedly represents the present value of the life earnings of an 18-year-old starting nine years post-trial at the average manufacturing wage and earning it until age 61.4 increased by 7% compounded annually. That argument is insupportable on plaintiff’s own evidence that Charles will be able to earn the minimum wage and therefore has not lost all earning power. .
We would therefore undertake to calculate Charles’s lost earnings using the factual evidence given by the economist. But we cannot approximate what Charles’s earnings as a manufacturing worker would have been because we have insufficient information to approximate an average starting wage. The average weekly wage (of all Louisiana manufacturing workers) as of *607 January 1975 was $188, the economist testified. However, the worker who had then worked 43 years would, by hypothesis [premise (1)], be earning 1.0742 (or 17.14) times as much as he earned in his first year, since inflation would have increased his pay by 4% and productivity by 3% compounded annually. On the other hand, the 18-year-old’s starting wage is the equivalent of the base pay of 43 years earlier raised for inflation alone 4% compounded annually over 43 years, to 1.0442 or 5.19 times the starting ■ pay of 43 years ago. Thus in 1975 the two extremes of pay are 17.14 and 5.19 times the starting pay of 43 years earlier, and, more important for our calculations, the average oldest worker gets 3.3 times the average pay of the youngest. But what the $188 overall “average” represents we cannot say. (If the wages were spread uniformly between a base and 3.3 times that base, the “average” would be 1.65 times base and the lowest — presumably that of the beginning 18-year-old — would be 60.6% of the average. According to this reasoning a beginner in 1975 would earn 60.6% of $188 or $113.94 a week, or $21.94 more than the $92 minimum wage. The present value of the life-long earnings loss, using the economist’s figures including 7% annual increases and discounting at 5%, would be only $90,011.)
The best approximation we can make relies on the $188 overall average manufacturing wage to include the 3% productivity raises of all the workers, and therefore allows only a 4% annual increase (the increase attributable to inflation). This approximation assumes that the 18-year-old earns less than the $188 average to start, but gets regular increases for productivity (ignoring inflation for the moment), so that by the end of his career he earns more than the $188 average: and that his own average pay (ignoring inflation) approximates that $188 average. Thus that $188 average already includes productivity increases, and we need adjust only for inflation, at 4% compounded annually. (This approximation is flawed in that the 3% productivity raise already present in an “average” wage was 3% of the lower wages of previous years, while the premise is that future wages will be 4% higher annually than those of previous years. We will make a rough allowance upward to compensate for this flaw.) On this basis the total earnings of an uninjured Charles Carollo as a manufacturing worker from age 18 in 1984 until retirement at age 61.4 would have a trial-time value of approximately $320,071 when discounted at 5%.[2]
Charles’s disability limits him, the employment specialist (psychologist) testified, to minimum wage. Rejecting the economist’s theory that minimum wage increases for productivity, we limit the minimum wage’s increase to 4% for inflation. We conclude that the trial-time value of the total minimum-wage earnings of the injured Charles Carollo would approximate $156,631 (rather than the economist’s figure of $303,782.05).
We would accordingly approximate Charles’s loss at $164,440 but, to compensate roughly for our error proceeding from use of the $188 average wage as including the full amount of the 3% productivity increases, we estimate his maximum lost earnings from the evidence to be about $200,000 (rather than the $316,990.19 that the economist would calculate by allowing, in addition to 4% inflation, both the 3% productivity and the overall average wage which already includes productivity increases).
*608 We note again that counsel argued to the jury, without foundation in the evidence, that Charles’s lost earnings were $620,000. We also note counsel’s argument for general damages based on units of time ranging from $1 a minute for the comatose period to a cent or so a minute for the bulk of his life. We believe this is not the case to rule on the propriety of unit-of-time argument to the jury, although this argument’s mathematical conclusion in the millions of dollars (not even discounted for the time on which they are based) may be an explanation for the excessive verdict.
We must view the jury’s quantum of $1,000,000 as awarding about $800,000 for general damages or as grossly overcompensating for lost earnings, perhaps by adopting plaintiff counsel’s confused view that plaintiff’s economist fixed them at $620,000, while allowing some $400,000 for general damages. In either case a substantial reduction is in order.
Money as a “repair,” C.C. 2315, of fault-caused general damages is difficult to understand. Charles Carollo’s damaged brain, personality, leg and arm cannot be repaired; his damaged life cannot be restored to its former promise. No amount of money can actually repair his nigh-useless left arm, or undo the pain he has suffered and will suffer. In a sense, we cannot speak in rational terms in relating physical injury itself to a monetary award as excessive or inadequate. Dolor and dollar are not commensurate: misery is not measurable in money at all, so one can never say the number of units is disproportionately high or low. By this reasoning, however, the jury could as well award a billion (or a hundred) as a million dollars.
In another sense, we not only can but must say that general damages do have limits, that some imprecise and indefinable relationship exists between the pain one has caused and the payment one should make in reparation. If money is at any time to be awarded to “repair” pain and suffering, no one would suggest an award so small as $100 to make reparation or amends for the dire injuries Charles Carollo has suffered. At the other extreme, we suppose no one would deem a billion dollars appropriate.
Our evaluation of the general damages proven convinces us that $200,000 approximates the maximum reasonably within the trial court’s much discretion. The jury’s allowance of about $400,000 to $800,000 is two to four times that maximum. We conclude that the jury has palpably abused its discretion and we reduce the total award for Charles to $400,000.
OTHER MATTERS
Defendants argue it was error to allow Charles Carollo to testify that his mother had the green light, in view of his damaged mental condition. We respond that credibility is a matter for the jury, and that the substance of this argument could properly have been argued to the jury. The trial judge did not err in this particular.
Defendants also argue that a new trial should have been granted because the investigating police officer was allegedly prejudiced against defendant. Since defendants had the information supportive of that allegation prior to trial, they were not entitled of right to a new trial under C.C.P. 1972(2), and we find no abuse of discretion in the trial judge’s refusal. Our view is similar towards defendants’ complaint that the jury foreman had filed a complaint against defendant employer with the Equal Employment Opportunity Commission.
Defendants also complain of the behavior of one juror’s husband, who had some brief discussion with two other jurors. The husband stayed at the trial its last day because his wife had developed a rash which might have required him to take her to the doctor. The wife had told the trial judge of her problem early that morning. The judge interrogated the husband under oath and satisfied himself that there had been no discussion of this case. We conclude that the trial judge handled the matter correctly, and that no mistrial should have been declared.
*609 DECREE
The judgment is amended to reduce the award for Janis Carollo to $80,000, that for Scott to $10,000, and that for Charles to $400,000. Plaintiffs are to pay the costs of appeal.

. We are uncertain that we correctly describe these figures. Our calculations of present values discounted at 5% for the minimum-wage ($2.30 hr. X 40 hrs. X 52 weeks = $4,784/year) and the manufacturing wage ($188/week X 52 weeks = $9,776/year), assuming an annual 7% increase, with employment beginning nine years hence (i. e., after trial time) and lasting 43.4 years, are $377,441 and $771,292 respectively. We used $10,000 a year as the 1975 wage in order to be able to multiply our results by .9776 for the $9,776 manufacturing wage or by .4784 for the $4784 minimum wage. In the 53 years from trial time until Charles reached 61.4 years, the $10,000 wage would have increased to $337,253.48 as his last year’s wage, although he would only work four tenths of a year at that salary, thus earning only $134,901.39. An initial investment in 1975 of $788,965 at 5% compounded annually would allow withdrawal in 1984 of $18,384.59 (to which a 7% annual increase would bring 1975’s $10,000 wage) and in each year thereafter an amount equivalent to wages increased 7% annually until the year 2027, at which time $134,911.40 would remain in the investment account to pay the $134,901.39. Thus $788,965 invested at 5% in 1975 would *606 pay Charles for the equivalent of a $10,000 wage increased 7% compounded annually during his 43.4-year work life beginning in 1984. For a similar present value for the minimum wage of $4,784 we multiply the $788,965 by .4784 ($4,784/$10,000); for the $9,776 manufacturing wage we multiply by .9776.
We recognize that nice mathematics is not required of a trier of fact in evaluating loss of future earnings, and that our supreme court has cautioned that future losses cannot be calculated with mathematical certainty, McFarland v. Illinois Central R. Co., 1961, 241 La. 15, 127 So.2d 183. However, mathematics was the guide used by plaintiff here and there can be no objection to the use of mathematical verities in estimating loss.

. An investment in 1975 of $327,405 at 5% compounded annually will grow by 1984 to $507,912.61, which would allow the withdrawal of $14,233.11 for 1984 as a first working-year’s wage equivalent (the equivalent of a 1975 wage of $10,000 per year increased by 4% annually) leaving $493,679.50 to remain invested at 5%. That fund so invested would enable the withdrawal each year of the same wage increased 4% annually until the year 2027, when its remainder would amount almost exactly to the $30,746.35 needed to pay the last four tenths of ■a year’s wages (the year’s wages by then having increased to $76,865.88).
The 1975 minimum wage of $2.30 an hour, or $4,784 a year, requires an initial investment of 47.84% of that $327,405; the 1975 manufacturing wage of $188 a week, or $9,776 a year, requires 97.76% of that $327,405.