JAMES F. McKAY, III, Chief Judge.
hThe defendant, Jamel L. Edgar, appeals his conviction and sentence. Finding no merit to his appeal, we affirm the conviction and sentence.
STATEMENT OF CASE
The defendant was charged by an indictment filed on June 11, 2009, with two counts of aggravated rape and two counts of aggravated kidnapping. He entered a not guilty plea on June 23, 2009, and on December 4, 2009, the district court denied the motions to suppress the evidence, statement, and identification. On May 23, 2011, the defendant’s trial began; it resumed on May 25, 2011, and concluded on May 26, 2011. The jury found the defendant guilty of attempted aggravated rape (count 1), attempted aggravated kidnapping (count 2), attempted forcible rape (count 3), and aggravated kidnapping (count 4). He was sentenced on August 11, 2011. On counts one and two, the defendant was sentenced to serve forty years at hard labor; on count three, he was sentenced to serve fifteen years at hard labor, and on count four, he was sentenced to serve life imprisonment at hard labor. The sentences are to be served without benefit of probation, parole or suspension of sentence and were ordered to run concurrently with each other and Lwith any other sentence that appellant may be serving. His motion for appeal was granted that same day.
STATEMENT OF FACT[1]
*26 M.L.[2], testified that in February 2009, she lived in New Orleans. At approximately 10:30 p.m. — 11:00 p.m. on February 9, 2009, she was walking home on Ursuline Street, near Claiborne Avenue. When she got to the intersection of Ursuline and Claiborne, a man, later identified as the defendant, driving a purple Chrysler drove up and offered her a ride home. She accepted his offer and got in to the car. They talked about her day. The defendant asked if she minded if he made one stop before dropping her off. She said yes, and they proceeded down Derbigny towards St. Bernard Avenue. At that point, the defendant pulled out a gun and put it in her face. He told her to perform oral sex and not to bite him, or he would shoot her. M.L. testified that the gun was a black semi-automatic, which she identified at trial. She stated she was very scared and complied with his order. M.L. testified that the defendant held the gun to her head while she did as he ordered.
When the vehicle came to stop, the defendant told her to stop. He told M.L. that they were going to get out of the car and go into his house. The defendant came around to the passenger side of the vehicle and got her out of the car. M.L. stated that she did not want to go into the house because she was afraid that the defendant was going to kill her. The defendant told her to close her eyes. She Inclosed her eyes at first and then opened them. When she opened her eyes, she saw two women in Muslin attire standing across the street. M.L. broke away from the defendant and ran towards the women, screaming for help. When they would not help her, she ran on Pauger Street and toned the corner. She ran another block and turned onto St. Anthony Street, where she saw a house that had lights on. M.L. banged at the door, and a woman answered. She asked the woman for help. The woman called the police, who arrived shortly thereafter. M.L. spoke with the police officer and rode in the back of the police car to the area where the defendant parked his vehicle. When M.L. saw the defendant’s vehicle on Pauger Street, she started crying and identified the vehicle for the officer. As they drove past the car, a woman jumped out of the car, yelling “Help, he’s raping me.” The police officers then apprehended the defendant. M.L. identified the defendant on the scene. Detective Haynes, one of the officers on the scene, asked her to submit to a rape kit, but she refused because the defendant did not ejaculate or penetrate her. M.L. stated that she did not want to be probed after everything she went through. She acknowledged that she had a prior conviction for prostitution in 1998 and a conviction for possession of cocaine in 1999. M.L. identified the defendant at trial as the perpetrator.
M.G.[3] testified that in the late evening hours of February 9, 2009, she was walking home from work when the defendant stopped his car, got out, pointed a gun at her and demanded that she get into the car. She was a kitchen helper at Brennan’s Restaurant. M.G. stated that she was walking on Dumaine Street between Orleans Avenue and Claiborne Avenue. Once she got into his car, the | ¿defendant told her to perform oral sex. When they arrived at his house, he told her to stop. M.C. noticed the gun and reached for it. She and the defendant fought for the weapon, and the defendant took it from her. He hit her in the head and told her to take off her clothes. As she was taking off her clothes, she saw the police vehicles passing. She jumped out the ear and *27 started screaming. The police officers took her and wrapped a sheet around her. The officers told the defendant to get out the car. M.G. acknowledged prior hospitalizations for her mental illness. She also acknowledged prior convictions for possession of cocaine, possession of drug paraphernalia and prostitution. M.G. identified the defendant at trial as the perpetrator.
New Orleans Police Officer Shacretta Pearson testified that on the night of February 9, 2009, she was working alone in a marked police vehicle. A little before midnight, she received a complaint call, went to 2407 St. Anthony Street, and met the homeowner, Mrs. Delores, who stated that the victim came to the house. The officer spoke with M.L., the victim, who told her she had been raped. When the officer arrived on the scene, the victim was hysterical and crying. It took the officer five minutes to calm the victim down. The victim stated that the incident occurred on Pauger Street. Officer Pearson contacted her sergeant and arranged to meet at the incident site. The victim stated that an unknown black male picked her up in the Sixth Ward area. The officer put the victim in her car, and they headed back to Pauger Street, looking for the perpetrator’s vehicle, a purple Chrysler. As they proceeded up Pauger Street, the victim began crying. When the officer observed a purple vehicle, she asked the victim if that was the vehicle. The victim answered affirmatively. The officer passed the vehicle and parked her car at the intersection of Rocheblave and Pauger Streets. Sergeant | sFrankIin’s vehicle was behind Officer Pearson’s vehicle. As the sergeant’s vehicle passed the purple vehicle, a half-naked woman jumped out of the purple vehicle, yelling “He is raping me.” The woman was naked from the waist down. The defendant exited the vehicle, and the officers ordered him to the ground. The officers then handcuffed him. Both victims identified the defendant in a one-on-one identification at the scene. The victims did not have any contact with each other. They were placed in separate police vehicles. The defendant was transferred to Central Lockup after the identification procedures. Officer Pearson stated that no cash was found in the defendant’s car.
Sergeant Rita Franklin testified that she was working the night of February 9, 2009, and the morning of February 10, 2009. Around midnight, she received a call from Officer Pearson because the officer needed to relocate from where the victim was located to the area where the incident allegedly occurred. She met up with Officer Pearson at the intersection of N. Tonti and Pauger. They were searching for a purple vehicle on Pauger Street. As Officer Pearson’s vehicle passed the purple vehicle, she informed Sergeant Franklin that it was the car in question. Sergeant Franklin then heard a woman calling for help and saw a partially nude woman running towards her. The woman was yelling that she had been raped. The woman was nude from the waist down. The officer observed the defendant getting out of the vehicle and ordered him to the ground. Officer Pearson handcuffed him, and he was later transported to Central Lockup. The officer spoke with the second victim, M.G. Sergeant Franklin identified the defendant at trial.
Detective Vernon Haynes, a member of the NOPD sex crimes unit, received the call of a rape from the dispatcher and relocated to the 3000 block of Pauger | (¡Street. When he arrived, he saw two female victims. Each victim was sitting in a separate police vehicle. An unknown male was in a third police vehicle. Photographs of the defendant’s vehicle and the scene were taken by the crime scene tech *28 nician. The officer identified photographs ■ taken of the vehicle and the scene. While the crime scene technician was processing the vehicle, Detective Haynes observed a black semi-automatic handgun on the floorboard. The gun and magazine of bullets, ten Smith & Wesson forty caliber live rounds, were removed from the vehicle. The. officer also observed several items of clothing on the back seat. Detective Paynes spoke with the two victims and Sergeant Franklin. He conducted one-on-one identifications with both victims at the scene. Each victim was in a separate vehicle when she identified the defendant as the perpetrator. Neither of the victims submitted to a rape kit. The vehicle was transported to police headquarters. While the vehicle was processed, it was not searched. The defendant was advised of his Miranda rights,' and he gave a statement to the officer. Detective Haynes made attempts to canvas the area for witnesses to no avail. There were no surveillance video tapes at the gas station where M.G. was forced into the defendant’s car.
Shannon Braud testified that in February 2009, she lived across the street from the defendant on Pauger Street. Ms. Braud stated that she knew the defendant and his fiancee, Deljuana Fisher. Ms. Braud testified that her son played basketball with Del’s son, and that the defendant was her son’s basketball coach. She stated that the defendant took her son and his cousin to practice three to four days a week, from 6:30 p.m. to 8:80 p.m. On the evening of February 9, 2009, she saw the ' defendant standing near his car talking to an unknown woman. The woman was tall and thin, and she had brown skin. She could not hear the ^conversation between the defendant and the woman. The woman noticed Ms. Braud and her cousin walking down the steps and walked over to them. The woman asked Ms. Braud if she could use her cellphone. Ms. Braud said no. .The woman then asked Ms. Braud-for a ride. Ms. Braud declined the woman’s request. Ms. Braud and her cousin got into her car and left. Ms. Braud stated that she observed the woman walk around the corner. Ms. Braud took her cousin, who lives in New Orleans East, home. When she returned thirty minutes later, there were police officers in the neighborhood. She stated that the police did not ask her any questions.
On cross-examination, Ms. Braud admitted that she did not know what playground her son played for. She also acknowledged that her son did not have a uniform for the basketball team. Ms. Braud stated that she left her house around 10:00 p.m. to take her cousin home. When she saw the defendant, he was wearing pants and a shirt. The unknown woman was wearing a skirt and blouse and carried a purse. Ms. Braud stated that she never saw a naked woman. Ms. Braud testified that she did not see the defendant drive up to the house. The defendant and the woman were already standing outside the car when she walked out of her house.
Keyta Harrell testified that in February 2009, she lived next door to the defendant and Deljuana Fisher. She stated that she did not know them well. On the night that the defendant got arrested, she had been watching television. She heard a man yell “Get away”, but did not go outside. At that time, she did not hear a female voice. About fifteen minutes later, she heard several voices outside. She went to her front door and saw police officers in the neighborhood. Ms. Harrell walked out onto her front porch. She saw police officers and two women standing outside a police vehicle at the corner of Pauger and Rocheblave. The first woman Nwas approximately 5'6" and slender. She wore something that looked like knickerbockers and had something on her head. *29 The second woman was short, stout and had light brown skin. She was wearing checkerboard black and white pants and a white chefs jacket. She was not naked and did not have a blanket wrapped around her. Ms. Harrell stated that she spoke with the police that evening. She acknowledged that she has a prior conviction for distribution of narcotics.
■ Deljuana Fisher testified that she has known the defendant since 2003. She stated that she lives at 3027 .Pauger Street with the defendant and her father. Her brother would periodically stay at the house. In February 2009, the defendant was not working and was receiving unemployment benefits. At that time, Ms. Fisher had two jobs. She would arrive home between 4:00 p.m. and 4:30 p.m. for her first job and then leave between 5:30 p.m. to 6:30 p.m. for her second job. In' the evenings, the defendant would coach basketball. Ms. Fisher stated that she and the defendant would talk periodically during the evening. She testified that she knew the area in which she lived was a high crime area, but the house was the most affordable. The house next door to her was robbed when she first moved to her- house. In response to the robbery, the defendant purchased a gun for protection. The defendant kept the gun in the driver side door of his car because she did not want the gun in the house. She was stopped once with the gun in the car. The police told her that the gun was considered concealed because it was not visible. Ms. Fisher testified that the defendant used the gun for protection only. He would walk around the house at night and in the early morning hours. Ms. Fisher stated that she was not at home when the defendant was arrested. On the evening of February 9th, she came home from her first job, had dinner with the defendant and Igleft around 6:00 p.m. to go to her second job. The defendant left a few minutes before her to go to a basketball game. Ms. Fisher stated that her father was at home that evening. She found out about the defendant’s arrest the next morning. Ms. Fisher testified that she and the defendant spoke two or three times that evening, the last call occurring between 10:00 p.m. and 11:00 p.m.
Jamel Edgar denied kidnapping and raping both victims. He testified that M.L. was never in his vehicle, and he did not force her to perform oral sex. The defendant acknowledged that he knew M.G. previously in 2004-2005 when he sold drugs on Dumaine Street. He further stated that he did not point a gun at M.G. or force her into his vehicle. The defendant testified that he became aware of the rape allegations when he was handcuffed and arrested. He acknowledged that he spoke with Detective Haynes, who advised him of his Miranda rights. The defendant signed a waiver of rights form and gave a recorded statement to the police. In February 2009, the defendant was unemployed. He lived at 3027 Pauger Street with his fiancee, Deljuana, and her father. The defendant stated he purchased a gun in 2007 because of burglaries in the neighborhood. After he purchased the gun, he kept the gun in his bedroom dresser drawer. He would walk around the house at night with the gun. However, Deljuana did not want the gun in the house. At the point, he kept the gun in his car. The weapon was placed in the driver’s side door.
The defendant testified that his usual day consisted of looking for employment, going to the grocery, running errands, cleaning around the house, and preparing dinner for himself and Deljuana. He stated that Deljuana would usually get home from her first job between 4:00 p.m. and 4:30 p.m. They would have dinner together, and then she would leave for her sec *30 ond job. The defendant |inwould go to basketball practice. He would pick up the children he coached, talk to the parents, and then go to practice, which would last about one to two hours. After practice, he would take the boys home. He stated that it took about thirty to forty-five minutes to take everyone home. The defendant testified that he had been coaching about seven to eight months at Pontchartrain Park in Gentilly. Once he got home, he would talk to Deljuana several times before going to bed.
On February 9, 2009, he left the house in the morning and went to apply for several jobs. He arranged for a couple of interviews. The defendant returned home, cleaned the house and cooked dinner. When Deljuana came home, they had dinner. After Deljuana left for work, he left to pick up the boys for practice. The defendant stated he left his house around 6:15 p.m. He picked up the children and went to practice. The team’s uniforms were green and gold. The defendant stated the team was called the Pontchartrain Patriots. After practice, he took the boys home. The last children to be dropped off were Shannon Braud’s son and nephew. The defendant then went to a friend’s house on the west bank.
He left his friend’s house after 10:00 p.m. The defendant stated that he stopped at a service station on the corner of Claiborne and Esplanade, where he saw M.G. The defendant testified that he knew M.G. in 2004-2005 when he was living in the Lafitte Housing Development. He stated that he stopped selling drugs after Hurricane Katrina. According to the defendant, M.G. approached him and asked if he was selling drugs. He told M.G. that he no longer sold drugs because he was trying to be a good father to his son. M.G. asked the defendant if he could drop her off in the Seventh Ward, near Rocheblave Street. The defendant agreed to give her a ride, and M.G. got into his vehicle. When they got to Burgundy Street, M.G. asked him to drop her off at a house on Dorgenois Street. The Indefendant stated that he knew it was a crack house and told M.G. that he was not going any further than Pauger and Roche-blave. M.G. stated that she would walk the rest of the way from Pauger to Dorge-nois Street.
When they arrived at his house, another woman, whom the defendant identified as M.L., approached his car. The defendant stated that he had seen M.L. before. He testified that he had seen M.L. when she picked up drugs from an old friend, with whom he used to play basketball. M.L. knocked on his driver’s side window and asked him if he had some drugs. He said no and told M.L. to get away. At that point, he took his gun out of the driver’s seat door and put it underneath the seat. The defendant then stepped out of the vehicle. He told M.L. to get out of his face. M.L. then walked across the street and spoke with Shannon, who was coming down the stairs of her house. After speaking with Shannon, M.L. walked to Roche-blave Street and went off with a guy dressed all in black. The defendant then went back to his car to retrieve several items. M.G. was still in the car. She told him about an old friend who had recently passed away.
About five to ten minutes later, police officers arrived. M.G. saw the police coming down the street, and she took drugs out of her pants pocket and put the drugs in her bra. When the defendant got out of his vehicle, the police vehicle made a U-turn. One of the police officers told him to get on the ground. M.G. then got out of the car. Initially she did not say anything, but shortly afterwards, told the officers that he raped and robbed her. The defen *31 dant was then handcuffed. The defendant testified that he told the male police officer that he did not rob M.G. The officer looked through the defendant’s pants and did not find any money. The defendant stated that he saw Shannon returning to the neighborhood and Keyta | ^standing on her front porch. The defendant was transported to the police station, where he gave a recorded statement.
ERRORS PATENT
A review of the record reveals one patent error on the face of the record. The record reflects that the district court denied appellant’s motions for post-verdict judgment of acquittal and for new trial on the day of sentencing, and it proceeded to sentence him that same date without waiting the required twenty-fours. La.C.Cr.P. art. 873 expressly requires a twenty-four hour delay between the denial of both a motion for new trial and a motion in arrest of judgment. This court has held that the same twenty-four delay is required in the case of the denial of a motion for post-verdict judgment of acquittal. State v. Green, 2010-0791, pp. 19-20 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 586, writ denied, 2011-2316 (La.3/9/12), 84 So.3d 551; State v. Wilson, 526 So.2d 348, 350 (La. App. 4 Cir.1988).
However, the failure to observe the twenty-four-hour delay is harmless where the defendant does not complain of the failure to observe the delay or his sentence. See State v. Duncan, 2011-0563, p. 8 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511 (delay after denial of motions for new and for arrest of judgment); State v. Green, 2010-1355, p. 12 (La.App. 4 Cir. 6/22/11), 69 So.3d 695, 703, writ denied, 2011-1672 (La.1/20/12), 78 So.3d 140 (delay after denial of motion for new trial). In the instant case, appellant has not raised a claim on appeal as to his sentence. Therefore, for this reason alone, any error by the trial court in failing to observe the delay is harmless.
ASSIGNMENT OF ERROR NUMBER 1
The defendant contends that the State failed to produce sufficient evidence to sustain his convictions because the victims’ testimony was not credible. The | ¶0,defendant was convicted of attempted aggravated rape and attempted aggravated kidnapping of M.L. and attempted forcible rape and aggravated kidnapping of M.G.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55.
In State v. Brown, 2003-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18, the Court set forth the standard for determining a claim of insufficiency of evidence:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, [20]00 — 0674 (La.6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that “assuming every fact to be proved that the evidence *32 tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291, 1293. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
The requirements for an attempt to commit a crime are provided in La. R.S. 14: 27.
|14A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
(2) Further, the placing of any combustible or explosive substance in or near any structure, watercraft, movable, or forestland, with the specific intent eventually to set fire to or to damage by explosive substance such structure, watercraft, movable, or forestland, shall be sufficient to constitute an attempt to commit the crime of arson as defined in R.S. 14:51 through 53.
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
La. R.S. 14:44 defines the crime of aggravated kidnapping:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
The elements of aggravated rape are set forth in La. R.S. 14:42.
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
*33 (2) When the victim' is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.
(5) When two or more offenders participated in the act.
11fi(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
The provisions of La. R.S. 14:42.1 provide for the definition of forcible rape.
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) Wfiien the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
 M.L. testified that while she got into the vehicle willingly, thinking that the defendant was taking her home, once he pulled out his gun, she was not free to leave. She stated that defendant put the gun to her head and ordered her to perform oral sex. She complied because she was in fear of losing her life. The defendant drove M.L. to his house and told her that they were going to go inside house to have sex. M.L.’s testimony supports the defendant’s conviction for attempted aggravated kidnapping because her’testimony established that the defendant forcibly seized and took the victim in his vehicle to his house with the intent of forcing her to perform oral sex and/or sexual intercourse. M.L.’s testimony also supports the defendant’s conviction for attempted aggravated rape. Her testimony established that the defendant used a weapon to force her to perform oral sex and threatened to kill her.
M.G. testified that she was walking home when the defendant stopped his vehicle, pulled out of gun and told her to get in the car. The defendant then drove M.G. to his house. En route, he put the gun to M.G.’s head and told her to perform luiOral sex. M.G.’s testimony supports the defendant’s convictions for aggravated kidnapping and attempted forcible rape. Her testimony revealed that the defendant forcibly seized and took the victim in' his vehicle to his house with the intent of forcing her to perform oral sex and/or sexual intercourse. Her testimony established that the defendant used a weapon to force her to perform oral sex.
The defendant argues that M.G.’s testimony is not credible because of her mental illness and delusional statements she made during trial. He also contends that there were inconsistencies in her testimony about the defendant robbing her and there was no evidence presented that supported her allegation that he robbed M.G. The defendant also suggests that M.L.’s testimony is not credible because it was controverted by Shannon Braud’s testimony.
*34 The jury heard the testimony of both victims and the defendant’s witnesses and assessed the credibility and weight to be given to the testimony presented. The jury was well aware of M.G.’s mental illness and heard her delusional statements. They also heard the testimony of the police officers that supported the victims’ testimony, especially the testimony of M.G. that she was half naked when she jumped out of the defendant’s vehicle.
When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 94-1895, p.7 (La. App. 4 Cir. 9/15/95), 661 So.2d 1078, 1084. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Helou, 2002-2302, p. 5 (La.10/23/03), 857 So.2d 1024, 1027; State v. Rosiere, 488 So.2d 965 (La.1986).
|17In the present case, it cannot be said that the jury abused its great discretion in determining to accept the testimony of the State’s witnesses over the testimony of the defendants’ witnesses. This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER 2
In this assignment, the defendant argues that the trial court erred in limiting his cross-examination of M.G. violating his right to confront the witnesses against him. The right to confront witnesses is ensured in both the federal and state constitutions. The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” La. Const, art. 1, § 16 guarantees each accused the right “to confront and cross-examine the witnesses against him.”
In State v. Draughn, 2005-1825, pp. 47-48 (La.1/17/07), 950 So.2d 583, 615-616, the Supreme Court noted that it had previously
held that “Confrontation means more than being allowed to confront the witnesses physically. ‘The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.’ ” State v. Robinson, 2001-0273, p. 6 (La.5/17/02), 817 So.2d 1131, 1135, citing Davis v. Alaska, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (internal citation omitted). Cross-examination has been termed “the principal means by which believability and truthfulness of testimony are tested.” Robinson, 2001-0273, p. 6, 817 So.2d at 1135.
Under the code of evidence, “a witness may be cross-examined on any matter relevant to any issue in the case, including credibility.” La. C.E. art. 611(B). The trial court is empowered to exercise reasonable control over the manner of cross-examination so as to (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid the needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. La. C.E. art. 611(A). “Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness.” Robinson, 2001-0273, p. 6, 817 So.2d at 1135. The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court’s broad discretion. State v. Irish, 2000-2086, p. 7 (La.1/15/02), 807 So.2d *35 208, 213, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); State v. Frost, 1997-1771 p. 32 (La.12/1/98), 727 So.2d 417, 439, cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).
The defendant argues that he sought to continue his cross-examination to show that the victim’s delusions affected her credibility. The trial transcript reveals that M.G. suffers from a mental illness. It was evident in her testimony at trial. The victim’s medical records were produced, which revealed that M.G. had been receiving treatment for her mental illness since she was a child. M.G. testified about her mental illness and hospitalizations. She acknowledged that she had been recently hospitalized. On cross-examination, defense counsel questioned M.G. about her hospitalizations and delusions. After several questions about the delusions, the trial court stopped defense counsel from asking any further questions about the delusions. Defense counsel indicated that the questioning was meant to prove that M.G. lacked credibility due to her delusions. The trial court stated that the victim’s mental condition was apparent from the testimony already elicited.
As to the mental qualities of intelligence and memory, a distinction must be made between attacks on competency and attacks on credibility. Sanity in any general sense is not the test of competency, and a so-called insane person may testify if he is able to report correctly the matters to which he testifies and if he understands the duty to speak the truth. McCormick on Evidence, § 45, p. 94 (Clearly Ed.1972). Mental abnormality either at the time of observing the facts or at the time of testifying, however, will be provable on cross examination or by extrinsic evidence, as bearing on credibility. State v. Landry, 359 So.2d 99 (La.1978); State v. Luckett, 327 So.2d 365, 372 (La.1976) (on rehearing); McCormick, supra; Pugh and McClelland, Work of the Appellate Court for the 1976-1977 Term-Evidence, 37 La. L.Rev. 585 (1977).
State v. Morris, 429 So.2d 111, 120 (La.1983).
In Carollo v. Wilson, 345 So.2d 601, 608 (La.App. 4 Cir.1977), the defendants argued that the trial court erred when it allowed seven year old Charles Carollo to testify despite his damaged mental condition, due to a ■ brain-stem injury. |19The court held that the trial court did not err because the witness’ credibility was an issue for the jury, and the witness’ mental condition could have been argued to- the jury.
In the case at bar, the trial court did not abuse its great discretion in limiting defense counsel’s cross-examination. M.G. had already testified concerning several of her delusions, including being Oprah Winfrey’s godchild and that the fate of the human race was in her scalp and hair. The trial court noted that M.G.’s testimony revealed the extent of her mental illness and delusions. The trial court determined that any continuing cross-examination on these issues would just subject M.G. to harassment or undue embarrassment.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 3
The defendant further suggests that the trial court erred in failing to hold an in camera hearing on M.G.’s competency to testify, and that his trial counsel was ineffective for failing to request an in camera hearing to determine M.G.’s competency to testify.
As noted above, the Louisiana Supreme Court recognizes a distinction between attacks on competency and attacks on credi *36 bility. State v. Morris, 429 So.2d 111, 120 (La.1983). “Sanity in any general sense is not the test of competency, and a so-called insane person may testify if he is able to report correctly the matters to which he testifies and if he understands the duty to speak the truth.” Id.
La. C.E. article 601 provides that “[e]very person of proper understanding is competent to be a witness except as otherwise provided by legislation.” Understanding, not age, is the test of whether any person shall be sworn as a witness. A key determination to be made is whether the witness is able to 12nunderstand the difference between truth and falsehoods. State v. Deutor, 2002-1869, pp. 6-7 (La. App. 4 Cir. 3/19/03), 842 So.2d 438, 442.
In State v. Guidry, 41,694 (La.App. 2 Cir. 2/28/07), 953 So.2d 943, the defendant argued that the trial court erred in allowing a witness to testify despite knowing that the witness was diagnosed as a paranoid schizophrenic with auditory hallucinations. The court found that the trial court did not err in finding that the witness was competent to testify.
Louisiana C.E. art. 601 provides that every person of proper understanding is competent to be a witness except as otherwise provided by legislation. Furthermore, a witness may testify to a matter based on personal knowledge. La. C.E. art. 602. Great weight is given to the trial judge’s determination of competency because of his or her opportunity to see and hear the witness. La. C.E. art. 104(A); State v. Willars, 27,394 (La.App. 2 Cir. 09/27/95), 661 So.2d 673. Matters such as mental defect go to the witness’ credibility, not to competency. State v. Wilkerson, 448 So.2d 1355 (La. App. 2d Cir.1984), writ denied, 450 So.2d 361 (La.1984).
⅜ ⅜: ⅝ ⅜ ⅜ ⅜
Although the trial court observed that the second part of the inquiry-Coleman’s personal knowledge-was “troublesome,” it found that the state established that Coleman had a proper understanding to testify by showing that he understood the difference between truth and lies. The trial court noted that issues of any disability relate to Coleman’s credibility and not his competency to testify. In Wilkerson, this court stated:
Certainly, this witness’ defects of capacity, sensory or mental, which would have lessened her ability to perceive the facts which [the witness] purports to have observed were provable to attack the credibility of the witness, either upon cross-examination or producing other witnesses to prove the defect. However, such matters go to [the witness’] credibility, not to [the witness’] competency, which was properly determined by the trial court. (Internal citations omitted.) State v. Wilkerson, 448 So.2d at 1361-1362. Finally, we note that the Louisiana Supreme Court has never ordered a blanket exclusion of jailhouse witness testimony. State v. Robinson, 2002-1869 (La.04/14/04), 874 So.2d 66, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004).
The record supports the trial court’s ruling that Coleman was competent to testify as a witness at Guidry’s trial. Coleman’s answers to questioning demonstrated that he had proper understanding and his testimony was based on personal knowledge. Although Coleman’s testimony did not include information regarding his actual diagnosis, it did include sufficient information regarding his prior mental incompetency to stand trial and history of auditory hallucinations. Therefore, based on our thorough preview of this record it cannot be said that the trial court’s determination was manifestly erroneous.
*37 Guidry, 41,694, pp.18-19, 953 So.2d at 952-953.
The issue of M.G.’s competency was not raised by the defendant at any time. At trial, the defendant raised the issue of her credibility due to her delusions and mental illness and was allowed to present evidence on the issue. M.G.’s testimony at trial concerning the events of February 9, 2009, revealed no indication of her mental condition. However, evidence of her medical condition became apparent when the State and defense counsel questioned M.G. about her hospitalizations and delusions.
Because the defendant never raised the issue of M.G.’s competency at trial and/or sought an in camera hearing on M.G.’s competency, the defendant is precluded from raising the issue of the trial court’s failure to conduct an in camera hearing on appeal. La.C.Cr.P. article 841; State v. Jenkins, 598 So.2d 558, 560 (La.App. 4 Cir.1992)(court held that because defense counsel neither put any information before the court as to the incompetency of the witness nor objected to the testimony, defendant was precluded from raising the issue on appeal.)
The defendant argues, in the alternative, that his trial counsel was ineffective for failing to request an in camera hearing on M.G.’s competency to testify.
Ordinarily, an ineffective assistance claim is better addressed in an application for post-conviction relief filed in the trial court in which a full evidentiary hearing can be held. State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient to permit a determination of counsel’s effectiveness at trial, the claims may be addressed on appeal. State v. McGee, 98-1508, p. 4 (La.App. 4 Cir. 3/15/00), 758 So.2d 338, 41. Indeed, when the appellate record is sufficient, “the interests of judicial economy justify consideration of the issues on appeal.” State v. Kanost, 99-1822, p. 6 (La.App. 4 Cir. 3/29/00), 759 So.2d 184, 188.
The standard for assessing an ineffective assistance of counsel claim is well-settled; the two-prong standard enunciated in the seminal case of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), must be applied. State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. In order to prevail, a defendant must establish both that counsel’s performance was deficient and that the deficiency prejudiced the defendant. Id. As to the former, the defendant must show that counsel made errors so serious that counsel was not functioning as the “counsel” the Sixth Amendment guarantees. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, 97-2061, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. As to the latter, the defendant must show that “counsel’s errors were so serious as to deprive him of a fair trial, i.e., a trial whose result is reliable.” McGee, 98-1508 at p. 5, 758 So.2d at 342. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068.
An “effective counsel” has been defined as “not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.” State v. Anderson, 97-2587, p. 7 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 19 (citing, State v. Seiss, 428 So.2d 444, 449 (La.1983)). Given that “opinions may differ on the advisability of a tactic, Ushindsight is not the proper perspective *38 for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Crowell, 99-2238, p. 8 (La. App. 4 Cir. 11/21/00), 773 So.2d 871, 878 (quoting State v. Brooks, 505 So.2d 714, 724 (La.1987)). It follows then “trial strategy” type errors do not constitute ineffective assistance of counsel. Crowell, 99-2238, at p. 8, 773 So.2d at 878 (citing State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir.1986)); State v. Bordes, 98-0086, p. 8 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147 (quoting Bienemy, 483 So.2d at 1107 (noting that “[t]his court has recognized that if an alleged error falls ‘within the ambit of trial strategy’ it does not ‘establish ineffective assistance of counsel.’ ”)).
The defendant has failed to disclose any additional evidence not presented at trial that defense counsel could have presented at an in camera hearing. The defendant references no new evidence concerning M.G.’s competency to testify. The trial transcript reveals that defense counsel introduced M.G.’s medical records into evidence and extensively cross-examined M.G. on the events of February 9th, as well as her mental illness, hospitalizations and delusions. Thus, the defendant has not shown how the failure to request an in camera hearing constituted ineffective assistance of counsel.
Accordingly, this assignment of error is without merit.
CONCLUSION
Accordingly, the defendant’s convictions and sentences are affirmed.
AFFIRMED

. Stephanie Ezidore is a complaint operator with the Communications Division of the New Orleans Police Department. She identified the 911 tapes and incident recall. She testified that the first call was received at 11:37 p.m. The incident recall indicates that the police officers arrived at Pauger Street and Rocheblave at 12:03 a.m. The 911 tapes were played for the jury.

. M.L. is the victim in counts one and two.

. M.G. is the victim in counts three and four.